**SAVERS FEDERAL SAVINGS & LOAN ASSOCIATION,**
Plaintiff–Appellee,

v.

**Horst R. REETZ and Kathleen K. Reetz, Defendants–Appellants.**

**No. 88–1618.**

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1989.

Robert R. Bodoin, Daniel A. Foster, Randy Lynn Agnew, McLean, Sanders, Price, Head & Ellis, Fort Worth, Tex., for defendants-appellants.

Clifton T. Hutchinson, Hughes & Luce, Dallas, Tex., for plaintiff-appellee.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

In this Texas law diversity case, defendants-appellants Horst R. Reetz and Kathleen K. Reetz appeal the district court's summary judgment awarding plaintiff-appellee Savers Federal Savings & Loan Association (Savers) recovery against appellants on their written guaranty of a promissory note (the Note) payable to Savers and executed by the Horst R. Reetz Trust (the Trust), a Texas general partnership of which appellants were the only partners. We affirm.

### Facts and Proceedings Below

On August 27, 1984, the Trust executed the Note, which was in the principal amount of $6,300,000, payable to Savers. Appellants individually executed a personal guaranty of payment of the Note. The Note was secured by two deeds of trust, each covering a separate parcel of real property in Dallas County, Texas. One deed of trust, executed by the Trust, cover-

ed property known as the Richardson Tech Center; the other deed of trust, executed by appellant Horst R. Reetz, covered what is referred to as the East Collins Road property. The Note was payable in monthly installments due on the first day of each month, the installments being of interest only for an initial period and thereafter of principal and interest. The Note also authorized acceleration of maturity in the event of default in any payment.[1] On November 24, 1986, Savers gave written notice to appellants that "[t]he note is in default for the non-payments of the August through November, 1986 installments of interest." On January 28, 1987, Savers gave written notice that the Note had been accelerated because of the Trust's failure to pay any of the interest installments due August 1, 1986 through January 1, 1987. Sometime after January 1987, the Trust petitioned for relief under Chapter 11 of the Bankruptcy Code.

Thereafter, on April 22, 1987, Savers filed this suit against appellants on their guaranty for the sum of $5,906,569.29, the then outstanding principal balance of the Note, plus interest, reasonable attorneys' fees, and collection costs. The complaint alleges the defaults in the Note payments, the giving of notice thereof, and of the acceleration of the Note's maturity as above stated.

Thereafter, on May 20, 1987, appellants, through counsel, filed their answer. The answer denied none of the allegations of the complaint, expressly admitted certain of the allegations, and as to the others merely stated that appellants were "unable to admit or deny."[2] No affirmative defenses or similar matters were alleged.

This answer was never amended, nor, until after final judgment, was it ever sought to be amended. Appellants filed no motions under Fed.R.Civ.P. 12. Although the answer prayed that Savers take nothing by its suit, nothing in the answer suggests any legal or factual basis for this prayer. On July 6, 1987, Savers filed its motion for summary judgment, with supporting brief and affidavits and sworn copies of the Note and the guaranty thereof executed by appellants. On July 24, 1987, appellants filed their response to the motion for summary judgment with supporting affidavit of appellant Horst Reetz. The response alleged the Trust's pending bankruptcy proceeding and requested that "this matter be abated until after October 1, 1987 to determine whether or not a plan of reorganization can be instituted and confirmed in the bankruptcy." Further, Horst Reetz's affidavit stated: "[I]t was my understanding that the guaranty was to be limited to the extend [*sic*] of $750,000 liability," and this allegation is repeated, as to both appellants, in their response.[3] No other legal or factual reasons for denying Savers' summary judgment motion are asserted in appellants' response or Horst Reetz's supporting affidavit. On July 28, 1987, the district court deferred decision on the motion for summary judgment "until October 1, 1987 to determine whether a reorganization plan can be confirmed and implemented in the [Trust's] bankruptcy."

During the pendency of the bankruptcy proceedings, the bankruptcy court granted Savers relief from the automatic stay imposed by section 362 of the Bankruptcy Code, and the substitute trustee in the deed of trust on the Richardson Tech Center

---

1. The Note provided: "If default be made in the payment of any installment of principal or interest under this Note and such default shall not be cured within ten (10) days after written notice of default is sent to Maker ... then ... the holder hereof may, at its option, declare the entire principal balance of and accrued interest on this Promissory Note immediately due and payable without notice or demand...." It further states: "Except as expressly provided herein, the Maker and any sureties, guarantors and endorsers of this Note jointly and severally waive demand for payment, presentment for payment, protest, notice of nonpayment or dis-

honor, notice of intent to accelerate, notice of acceleration, ... notice and protest...."

2. No reason for this inability was asserted in certain instances; in other instances, it was asserted that appellants had "insufficient knowledge"; in the remaining instances, it was asserted that the allegation in question "calls for a legal conclusion."

3. This matter of the understanding of appellants concerning the extent of their liability on the guaranty is not raised on appeal.

posted that property to be nonjudicially foreclosed under the deed of trust on August 4, 1987. The property was sold to Savers for $3,000,000 at the foreclosure sale on that date, with the Note being then credited in that amount, but Savers and the substitute trustee later rescinded the sale because it was discovered that "there might have been deficiencies" in giving notice of the sale, and the property was posted for a second sale to be conducted on September 1, 1987. Savers was again the successful bidder for $3,000,000 at the September 1, 1987 sale. On November 3, 1987, the substitute trustee in the deed of trust on the East Collins Road property, after notice, sold that property at nonjudicial foreclosure sale to Savers for $1,000,000, which was then credited on the Note.

The bankruptcy court dismissed the Trust's petition on December 31, 1987.

On February 9, 1988, Savers filed a supplemental motion for summary judgment, supported by affidavits and copies of the trustee's foreclosure deeds, and informed the court that the foreclosures of the two properties had resulted in the referenced credits to appellants' indebtedness. Appellants filed a response to the supplemental motion for summary judgment in which they asserted only that there was no deficiency because, when foreclosed on, the Richardson Tech Center had a fair market value of $6,000,000 and the East Collins Road property had a fair market value of $2,000,000, which in combination exceeded the amount owed on the Note (there being no dispute as to that amount). Two affidavits were attached to this response, one as to the value of the Richardson Tech Center, the other as to the value of the East Collins Road property. In rejoinder, Savers objected to the affidavits as not being made on personal knowledge, and further asserted that in any event market value was irrelevant because there was no claim that there was any irregularity in the foreclosure which caused or contributed to any inadequacy in price. Responding on March 28, 1988 to this rejoinder, appellants merely contended that the affidavits as to market value were not hearsay. On April 26, 1988, the district court granted Savers' motion.

The court concluded that the facts were undisputed and that appellants had asserted only two matters in opposition to the motion for summary judgment, namely, that they signed the guaranty "on the understanding" that their liability would be limited to $750,000 and that the value of real estate at the time of foreclosure exceeded the amounts credited on the Note when Savers purchased the property at the foreclosure sales. The district court rejected the former contention, and no complaint is made in this regard on appeal. As to the latter contention, the district court ruled that the value of the property was immaterial since there was no claim of any irregularity in the foreclosures. On May 10, the court entered a final judgment for Savers and against appellants for $3,600,979.67 plus interest and court costs.

Thereafter, appellants, who had obtained new counsel on May 6, 1988, filed on May 24, 1988 motions for leave to file a supplemental answer, for a new trial, to vacate and/or to reconsider summary judgment and for a rehearing, and, subsequently, for leave to file an original counterclaim and to join the Trust. By way of these pleadings, appellants attempted to assert various new defenses to Savers' claims. The court denied all of these post-judgment motions on August 4, 1988.

### Discussion

Appellants' contentions on appeal fall into two categories, those based on the record as it stood when the district court rendered summary judgment, and those based on denial of appellants' post-judgment motions. We consider them in that order.

### I

#### Summary Judgment

*(a) Note acceleration and foreclosure procedure*

Appellants attack the summary judgment on three grounds. The first two, which we consider in this part (a), are that there was inadequate demand and notice of intention to accelerate and that the Rich-

ardson Tech Center trustee foreclosure sale was procedurally improper.

We reject each of these two contentions because they were never even hinted at prior to the post-judgment motions. To allow them to be first raised after judgment "would encourage trial by ambush." *Smith v. Olin Chemical Corp.*, 555 F.2d 1283, 1285 (5th Cir.1977). Thus we have rejected the assumption "that the entire record in the case must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered" and have stated that "[t]o the contrary, Fed.R.Civ.P. 56(e) 'requires ... the nonmoving party to ... *designate* "specific facts showing that there is a genuine issue for trial." ' " *Nissho–Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (emphasis in original). *See also Franz Chemical Corp. v. Philadelphia Quartz*, 594 F.2d 146, 150 (5th Cir.1979); *DeBardeleben v. Cummings*, 453 F.2d 320, 324 (5th Cir.1972). And, we have specifically refused to overturn a summary judgment on a theory not advanced in opposition to the motion in the district court. *See Batterton v. Texas General Land Office*, 783 F.2d 1220, 1224–25 (5th Cir.), *reh'g denied*, 789 F.2d 316 (5th Cir.1986); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1163–64 (5th Cir. 1983).[4] In *Batterton*, we reapproved and applied *Hargrave*'s holding that even a pleaded theory was waived when it was not raised in opposition to a motion for summary judgment. That the matter was subsequently raised in the district court by a motion to reconsider the summary judg-

ment did not suffice to save the day for the nonmovant in *Batterton*. *Id.* at 1225. *See also C.F. Dahlberg & Co., Inc. v. Chevron U.S.A. Inc.*, 836 F.2d 915, 920 (5th Cir.1988) ("[T]he opponent ... may not wait until trial or appeal to develop claims or defenses in response to the summary judgment motion.... [Q]uestions not presented to the trial court will not be considered on appeal."); *Calmaquip Eng. West Hemisphere v. West Coast Carriers*, 650 F.2d 633, 637 (5th Cir.1981) (declining to consider defenses to summary judgment not raised in pleadings, pre-trial order, or memorandum in response to motion for summary judgment). This follows from the general rule that "[t]he parties cannot ... advance new theories or raise new issues in order to secure a reversal of the lower court's" grant of summary judgment. Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2716 at 651–54 (footnotes omitted). *See also Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983) ("It is a well settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.").[5]

Here we conclude that Savers made an adequate *prima facie* showing of proper acceleration and foreclosure so as to authorize the summary judgment granted in the absence of any challenge by appellant to the propriety of the acceleration or of the foreclosure procedures.[6]

---

**4.** Likewise, it is settled that the correctness of a district court's grant of summary judgment may not be determined on the basis of evidential material first put of record after the summary judgment is granted. *See, e.g., Waltman v. International Paper Co.*, 875 F.2d 468, 473–74 (5th Cir.1989).

**5.** Similarly, an appellant has "waived its arguments not presented below" and "we will not disturb ... [a district court] decision on the basis of a legal theory asserted for the first time on appeal." *McDonald v. Board of Mississippi Levee Commissioners*, 832 F.2d 901, 909 (5th Cir.1987). Indeed, "the trial court cannot have erred as to matters which were not presented to

it." *Gabel v. Lynaugh*, 835 F.2d 124, 125 (5th Cir.1988).

**6.** In their answer, appellants expressly *admitted* the allegations of the complaint that on November 24, 1986, the Note was in default for non-payment of the August through November 1986 interest installments, and that Savers gave appellants and the Trust written notice of such default "and demanded payment for the past due installments and expressed its intent to accelerate should the defaults not be timely cured" and, "the defaults not having been cured," accelerated the Note on January 28, 1987 and gave written notice thereof to appellants and the Trust. Appellants now contend that the November 24 notice, copy of which was attached to the

## (b) Inadequate price at foreclosure

Appellants did properly raise in opposition to Savers' supplemental motion for summary judgment the contention that there was no deficiency on the Note because the asserted fair market values of the properties when foreclosed—approximately $8,000,000 or twice the $4,000,000 total for which Savers bid in the properties and credited the Note—exceeded the

complaint, was deficient because it did not clearly demand payment to cure the default and did not refer to the ten-day grace period provided in the Note (*see* note 1, *supra*). However, the Note (which was before the district court for summary judgment), although it does require written notice of default—which was complied with—expressly waives, *inter alia,* "demand for payment" and "notice of intent to accelerate" (as well as "presentment for payment," etc.). *See* note 1, *supra.* Such waivers are valid. *See Real Estate Exchange, Inc. v. Bacci,* 676 S.W.2d 440, 441 (Tex.App.—Houston [1st Dist.] 1984 no writ). The notice and demand requirement exist "in the absence of a waiver." *Ogden v. Gibraltar Sav. Ass'n,* 640 S.W.2d 232, 233 (Tex. 1982). *Cf.* Tex.Prop.Code § 51.002(d) (effective January 1, 1988, twenty-day grace period before acceleration mandatory where property is debtor's residence). Further, the Note was not accelerated until January 28, 1987, and the substitute trustee's deeds (before the court on summary judgment) recite that acceleration followed written demand and notice of intent to accelerate, and such recitations are presumed to be correct unless rebutted. *See Kirkman v. Amarillo Savings Ass'n of Amarillo,* 483 S.W.2d 302, 306 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r. e.).

Appellants also claim that the deed of trust foreclosure on the Richardson Tech Center was improper because the substitute trustee's deed for the September 1, 1987 foreclosure sale showed that the prior sale thereof on August 4, 1987 had been rescinded by Savers and the substitute trustee because "there might have been certain deficiencies" in the notice of sale. The summary judgment affidavits showed that Savers was the purchaser at both sales and that at each the price was $3,000,000, and that the credit on the Note in that amount was made as of August 4, 1987. Contrary to appellants' argument, it is not necessarily the case that a trustee under a deed of trust cannot resell after an initial sale is found to have been invalid. *See Texas Loan Agency v. Gray,* 12 Tex.Civ.App. 430, 34 S.W. 650 (1896, writ ref'd); *Burton v. Dumestre,* 86 F.2d 947, 949 (5th Cir.1937). *See also Ellis v. Michigan Realty Co.,* 138 S.W.2d 880, 883 (Tex.Civ.App.—Galveston 1940, writ ref'd) ("We know of no rule which prevents a second sale of property under a deed of trust where all prerequisites of said sale have been complied with."). Accordingly, in light of the fact that there was no challenge to the regularity of the foreclosure sales procedures prior to final judgment—as appellants themselves admit (for example, their May 24, 1988 post-judgment brief in support of their motion for reconsideration states: "Defendants' prior counsel ... raised only one issue in an effort to defeat Plaintiff's Motions for Summary Judgment.... [T]he issue of the fair market value of the properties received at foreclosure sale.... Defendants' prior counsel, an attorney of some years, should have recognized that in the absence of some irregularity in the foreclosure sale procedure courts generally do not inquire as to the fair market value of the property foreclosed upon. This tenet of Texas jurisprudence should have alerted counsel to the fact that the defensive issues raised in response to Plaintiff's Motion for Summary Judgment would not be sufficient to avoid the rendition of summary judgment which indeed occurred....")—we hold that Savers' *prima facie* showing was sufficient.

We further observe that the affidavits filed in reference to appellants' post-judgment motions reflect that the only deficiency in the notice respecting the August 4, 1987 sale was that the written notices to the debtors were hand delivered to them twenty-one days before the sale, rather than being mailed to them certified mail as required by Tex.Prop.Code § 51.002(b)(3). Although a sale without the required twenty-one days' notice is invalid or void, *Lido Int'l v. Lambeth,* 611 S.W.2d 622 (Tex.1981); *Phipps v. Fuqua,* 32 S.W.2d 660, 662 (Tex.Civ.App.—Amarillo 1930, writ ref'd), where the debtor actually timely receives the notice required by section 51.002(b)(3) there is a sufficient compliance with that requirement. *Forestier v. San Antonio Savings Ass'n,* 564 S.W.2d 160, 163 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.); *Hausmann v. Texas Savings & Loan Ass'n,* 585 S.W.2d 796, 800 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r. e.); *Johnson v. First Southern Properties, Inc.,* 687 S.W.2d 399, 402 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). *Cf. Lambeth,* 611 S.W.2d at 664 (noting no actual notice and citing *Forestier* and *Hausmann* ); *Mitchell v. Texas Commerce Bank,* 680 S.W.2d 681, 683 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) (distinguishing cases where departure from mailing requirements "did not cause any delay in the delivery of the notice to the debtor"). Nor could timely hand delivery in lieu of delivery by certified mail have caused or contributed to any inadequacy of price at the foreclosure sale. There was nothing in the material filed post-judgment to suggest any other questionable aspect respecting the August 4 sale procedures, and the record indicated these were otherwise valid. Doubtless this was why the matter was not raised pre-judgment. The contentions about the sale procedures appear to have been presented as a vehicle to open up the judgment so that other, unrelated defenses could be raised.

amount then outstanding on the Note (there being no dispute as to that amount). We hold that the district court properly rejected this contention.

■ We conclude under controlling and long-established Texas law that where there has previously been a valid nonjudicial deed of trust foreclosure on real property securing a debt, the amount to be credited on the debt for deficiency judgment purposes is the amount received at the foreclosure sale; that inadequacy of the consideration received on the foreclosure sale cannot alone invalidate an otherwise valid deed of trust nonjudicial foreclosure on real estate; that in order for inadequacy of consideration to have that effect, there must also be some irregularity in the foreclosure which caused or contributed to cause the real property to be sold for a grossly inadequate price; and that all these rules are fully applicable where the creditor is the purchaser at the foreclosure. *Tarrant Savings Ass'n v. Lucky Homes, Inc.,* 390 S.W.2d 473, 475 (Tex.1965); *American Savings & Loan Ass'n v. Musick,* 531 S.W.2d 581, 587 (Tex.1975); *Maupin v. Chaney,* 139 Tex. 426, 163 S.W.2d 380, 382–84 (1942). *See also,* e.g., *McKennon v. McGown,* 11 S.W. 532, 533–34 (Tex. 1889); *Sparkman v. McWhirter,* 263 S.W.2d 832, 837 (Tex.Civ.App.—Dallas 1954, writ ref'd); *Whalen v. Etheridge,* 428 S.W.2d 824, 830 (Tex.Civ.App.—San Antonio 1968, writ ref'd n.r.e.); *Forestier v. San Antonio Savings Ass'n,* 564 S.W.2d 160, 165 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.); *Lawson v. Gibbs,* 591 S.W.2d 292, 295 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Edmundson Investment Co. v. Florida Treco, Inc.,* 633 S.W.2d 599, 602 (Tex.App.—Houston [14th Dist.]), *writ ref'd n.r.e.,* 640 S.W.2d 859 (Tex.1982).

Appellants rely on three recent court of appeals decisions, two by the Beaumont Court, *Lee v. Sabine Bank,* 708 S.W.2d 582 (Tex.App.—Beaumont 1986, writ ref'd n.r. e.), and *Halter v. Allied Merchants Bank,* 751 S.W.2d 286, 287 (Tex.App.—Beaumont 1988, writ denied), and one by the El Paso Court, *Olney S & L v. Farmers Market of Odessa,* 764 S.W.2d 869 (Tex.App.—El Paso 1989, writ application pending). We consider these cases in turn.

*Lee* involved a deficiency claimed by a mortgagee who had foreclosed its "first preferred maritime mortgage on the [mortgagor's] vessel" in what were apparently judicial foreclosure proceedings in Baton Rouge, Louisiana, where the mortgagee purchased the vessel "at a marshal's sale." 708 S.W.2d at 583. Suit was later brought by the mortgagor in Texas and the mortgagee cross-acted for a deficiency and recovered judgment in the trial court. The mortgagor appealed, claiming that the trial court erred in calculating the deficiency on the basis of the foreclosure sales price rather than the assertedly higher then fair market value of the vessel. The Beaumont Court, relying exclusively on our decisions in *Walter E. Heller v. O/S Sonny V,* 595 F.2d 968 (5th Cir.1979), and *Bollinger & Boyd v. Motor Vessel, Captain Claud Bass,* 576 F.2d 595 (5th Cir.1978), which concerned deficiency judgments under the Ship Mortgage Act, 46 U.S.C. §§ 951, 952, 954 (now 46 U.S.C. §§ 31325, 31326), stated that the then fair market value, rather than foreclosure sales price, was the appropriate measure to calculate the deficiency, at least where there was a significant disparity and the creditor was the purchaser at foreclosure. 708 S.W.2d at 584. However, the Beaumont Court nevertheless affirmed the trial court because there was "almost no real evidence of the fair market value of the vessel." *Id.* at 585. While we have no particular quarrel with *Lee*'s reading of our prior decisions, they say absolutely nothing about the Texas law respecting deficiency judgments following deed of trust foreclosure on Texas real estate. Indeed, in *Heller,* we pointed out that "we must apply federal law" and that, under the Ship Mortgage Act, "[q]uestions concerning deficiency judgments ... are ... governed by federal law." 595 F.2d at 971. To the same effect is *Bollinger & Boyd,* 576 F.2d at 597. *See also J. Ray McDermott & Co., Inc. v. Vessel Morning Star,* 457 F.2d 815 (5th Cir.) (en banc) ("federal law governs deficiency judgments under the Ship Mortgage Act"), *cert. denied,* 409

U.S. 948, 93 S.Ct. 271, 292, 34 L.Ed.2d 218 (1972). *Cf.* Tex.Bus. & Com.Code § 9.104(1) (Uniform Commercial Code chapter 9 inapplicable to extent Ship Mortgage Act applies). *Lee* does go on to say that the *Heller* rule "should be applied in Texas law" and "we know of no reason why it should be restricted to ships." 708 S.W.2d at 584. These statements, however, are the purest dicta, as the issue in this respect before the *Lee* court was governed by federal law and involved only a ship.[7] And even the dicta does not expressly extend to real estate foreclosures governed by Tex. Prop.Code § 51.002. Moreover, the dicta is not persuasive respecting such foreclosures, as *Lee* does not cite a single decision of any Texas court or of any court purporting to apply Texas law.

In *Halter*, the Beaumont Court *was* faced with a deficiency suit following nonjudicial foreclosure of a deed of trust on real estate. The trial court granted the creditor bank's motion for summary judgment, calculating the deficiency based on the amount for which the property sold at the foreclosure, despite the debtor's opposition evidence that this amount was approximately one-third of the property's then market value. On the debtor's appeal, the *Halter* court rejected the argument that gross inadequacy of consideration paid by the creditor at a trustee's sale is not alone enough to justify calculating the deficiency on a basis other than the foreclosure price. Nevertheless, *Halter* affirmed the trial court's judgment because "the trial court had no evidence before it that the [creditor] Bank or its surrogate purchased the property at foreclosure." 751 S.W.2d at 288. Thus, the *Halter* opinion's remarks concerning inadequacy of consideration paid by the creditor at foreclosure were dicta, because there was no evidence that the creditor was the purchaser at foreclosure.

Moreover, this *Halter* dicta is not persuasive. In the first place, the only authority cited in support of it is *Lee*, which is itself unpersuasive dicta in this respect for the reasons above noted. *Halter* does attempt to distinguish the Texas Supreme Court's decision in *American Savings & Loan Ass'n v. Musick, supra*, which held that gross inadequacy of consideration paid by the creditor at the nonjudicial foreclosure sale was not grounds for setting the sale aside unless there was an irregularity in the sale which caused or contributed to cause the real property to be sold for a grossly inadequate price. *Halter* reasoned that *Musick* did not apply because it dealt only with the validity of the foreclosure sale, not with the issue of a deficiency judgment. *Halter*, 751 S.W.2d at 287. This reasoning, however, is inadequate to sustain the *Halter* dicta. In the first place, it does not take into account the Texas Supreme Court's decision in *Tarrant Savings Ass'n, supra*, which applied the same above-stated rule as applied in *Musick* in holding that the creditor was entitled to a deficiency judgment with the credit measured by the amount for which the creditor had purchased the property at the deed of trust nonjudicial foreclosure sale, rather than by its then greater fair market value. *Tarrant Savings Ass'n*, 390 S.W.2d at 475–76. We also observe that *Musick* cites *Tarrant Savings Ass'n* with approval. *Musick*, 531 S.W.2d at 587. However, the majority opinion in *Halter* does not even cite *Tarrant Savings Ass'n*, much less attempt to distinguish it. Yet *Tarrant Savings Ass'n* is directly in point and contrary to the *Halter* (and *Lee*) dicta.

In the second place, *Halter*'s attempt to distinguish *Musick* on the basis that it involved only the validity of the foreclosure sale, and not any issue of deficiency, also fails to take account of the Texas Supreme Court's decision in *Maupin v. Chaney, supra*—likewise not cited in *Halter*—where it was held that if the deed of trust nonjudicial foreclosure sale at which the creditor purchased the property was valid then the creditor was entitled to a deficiency judgment with the credit being in the amount for which the creditor purchased the property at the sale, rather than in the amount

---

7. Indeed, even under federal law, the issue did not have to be reached, as *Lee* found there was no evidence of the ship's market value, and hence affirmed the trial court's calculation of the deficiency based on the price paid by the mortgagee at foreclosure. 708 S.W.2d at 585.

of the assertedly then higher market value of the property. *Maupin*, 163 S.W.2d at 384. It may be noted that this holding of *Maupin* was relied on in *Tarrant Savings Ass'n.*, 390 S.W.2d at 475. Thus, contrary to the suggestion in *Halter*, if the foreclosure sale is valid under *Musick*, then it follows that the amount of the deficiency *is* calculated by having the credit equal the foreclosure sale price rather than the allegedly then greater market value of the property.[8] Finally, so far as *Halter* suggests that its theory is applicable where the creditor (rather than a third party) is the one who purchases at the foreclosure sale, this is likewise refuted by *Musick, Tarrant Savings Ass'n*, and *Maupin*, in all of which the creditor (or its surrogate) was the purchaser. *See also McKennon v. McGown, supra* (same rule in execution sale).[9] Accordingly, we are not persuaded by *Halter*.

The remaining case relied on by appellants in this connection is the El Paso Court's decision in *Olney*, 764 S.W.2d 869. There Home, the creditor, after purchasing the property at nonjudicial foreclosure sale under the deed of trust, sued the corporate debtor and two individuals, Taylor (the debtor's president) and Patterson, whom it alleged were personal guarantors of the debt, for deficiency. Taylor and Patterson counterclaimed against Home, alleging that Home had fraudulently altered the guaranty instrument from a corporate guaranty to a personal one, and sought actual and punitive damages for resulting impairment of their credit and mental anguish. The trial court rendered judgment against Home on the jury verdict, which found there was no deficiency, that Home had knowingly altered the guaranty and had acted in bad faith in suing Taylor and Patterson, who were awarded $50,000 actual and $375,000 punitive damages against Home. Home appealed, and the El Paso Court, in an opinion by Justice Fuller, remarked: "We are concerned primarily with the suit against Appellees Taylor and Patterson." *Id.*, 764 S.W.2d at 870. Justice Fuller's *Olney* opinion reflects that Home, "used its [foreclosure] bid price of $150,000 in order to determine the deficiency" and that Home had had the property appraised for $200,000 and eight days after foreclosure actually sold it for $200,000 to a third party. 764 S.W.2d at 871.[10] The opinion rejects Home's claim that the trial court erred by admitting "evidence concerning the sale of the property after foreclosure." *Id.* In this connection, it first notes that Home, by its trial pleadings, had assumed the burden of showing that $150,000 was a fair price and that the post-foreclosure $200,000 sale was relevant to that issue, and then, citing *Lee* and our *Heller* opinion on which *Lee* relied, states that a deed of trust creditor "must, in the event of foreclosure, make an honest effort to reduce the loan as much as possible by securing a fair price for the collateral." *Id.* However, it goes on to say, "[t]he evidence was also admissible due to the claims by Appellees Taylor and Patterson of bad faith, fraud and intentional infliction of mental anguish by Home" and that "[w]hile the

---

**8.** We also note that there may be a certain arbitrariness in using the fair market value standard in the deficiency context, but not in challenges to the foreclosure sale. Under such an approach, the creditor who acquires the property by a less than market value bid (for credit on the debt) at foreclosure would profit at the debtor's expense *if* the market value exceeds the outstanding debt, but not otherwise. Thus the debtor who borrows giving more security, or who pays his debt down further before defaulting, would on that account receive less protection under such an approach.

**9.** We further observe that if the creditor can be the purchaser at foreclosure only by assuming the risk that a jury in a later deficiency action may find that the property's fair market value exceeded the purchase price, then the creditor (having in mind the notorious imprecision and wide range of real estate fair market value calculations) might well in certain instances prefer to allow the property to be sold to a third party for a lesser amount (which under *Halter* would not be subject to later question), with ultimate prejudice to the debtor. Of course, if the debtor is insolvent or has no significant nonexempt property, then the creditor would likely not be influenced by such considerations; but, by the same token, in instances of that kind a deficiency action would similarly be unlikely.

**10.** The opinion does not recite the amount of the original debt, or how much was outstanding just before foreclosure, or what amount of deficiency Home asserted.

evidence of the entire transaction was admissible, we find that the issues were improperly submitted." *Id.* A method of submission on retrial, involving an issue as to whether the foreclosure price "was fair and reasonable," is then suggested if raised by the evidence. *Id.* The *Olney* court also reverses because of the trial court's failure to submit Home's requested issues concerning reformation of the guaranty. *Id.* at 871–72. Chief Justice Osborn wrote a concurring opinion, agreeing with the reversal and remand, but not with the majority's treatment of the deficiency issue. As to that issue, Chief Justice Osborn concluded that inadequacy of consideration was not a ground to invalidate a foreclosure sale unless there was an irregularity in the sale which caused or contributed to cause the property to be sold for a grossly inadequate price, and that if the sale was valid, the amount of the sales price was the proper amount to credit on the debt. 764 S.W.2d at 873.

We are likewise not persuaded by Justice Fuller's *Olney* opinion.[11] To begin with, the language in Justice Fuller's opinion relied on by appellants is essentially dicta. The points to which this language was related concerned the admissibility of evidence, which the opinion states was admissible on other grounds in any event; further, reversal and remand was likewise in any event required on still other grounds. Nor is the dicta persuasive, as it relies only on *Lee* and our *Heller* opinion, both of which are Ship Mortgage Act cases, as discussed above. Justice Fuller's *Olney* opinion does not cite or attempt to distinguish the controlling Texas Supreme Court decisions such as *Tarrant Savings Ass'n*, *Musick*, and *Maupin*.

In this diversity case we are bound to apply Texas law, whether or not we "agree" with it. But it is settled Texas law that a Texas Court of Appeals must, in civil cases, follow the law as established by the Texas Supreme Court. The dicta in *Lee*, *Halter*, and *Olney*, relied on by appellants, is contrary to the Texas Supreme Court's holding in *Tarrant Savings Ass'n*. Moreover, the Texas Supreme Court's holdings in *Maupin* and *Musick* taken together likewise demand rejection of this dicta.

We are further strengthened in this conclusion by our consideration of the Texas statutory scheme regulating real estate foreclosures under deeds of trust with power of sale. For at least the last century, Texas has had statutes directed solely at the governance of that particular subject matter. Presently, the relevant statute is Tex.Prop.Code § 51.002. Predecessor statutes include Acts 1889, at 143; Acts 1915, at 84; Acts 1915, 1st C.S., at 32; Article 3810, Revised Civil Statutes of 1925. These enactments all generally required that the sale be in the county where the land was located[12] "at public vendue between the hours of 10 o'clock a.m. and 4 o'clock p.m. of the first Tuesday in any month" and that for at least three consecutive weeks prior thereto written notice of the sale have been posted at the county courthouse door and at two other "public" places in the county. While the statute remained for many years thereafter in the form in which it appeared in the 1925 revision, it was substantively amended in 1975, 1983–84, and 1987. The 1975 amendments merely eliminated the requirement for posting notice of the sale at places other than the courthouse door and added the require-

---

11. Justice Woodard was the third justice on the *Olney* three-judge panel. 764 S.W.2d at 870. The West Publishing Company report of *Olney* shows, just following Chief Justice Osborn's opinion, a separate paragraph stating simply: "WOODARD, J., concurring." 764 S.W.2d at 873. It is unclear to us whether Justice Woodard concurred with Justice Fuller's opinion, or with Chief Justice Osborn's opinion, or simply concurred in the result. In either of the latter two alternatives, Justice Fuller's opinion would not be the majority opinion. However, for present purposes, we assume, *arguendo* only, that Justice Woodard concurred with Justice Fuller.

12. Though the statutes did not expressly specify that the sale be at the courthouse, this was the virtually universal custom. *Cf. Dall v. Lindsey*, 237 S.W.2d 1006, 1009–10 (Tex.Civ.App.—Amarillo 1951, writ ref'd n.r.e.) ("[I]t is difficult to conceive of a deed of trust being drawn without a recital therein that in case of default the land would be sold at the courthouse door of the county wherein the land lies.").

ment that written notice of the sale be given by certified mail at least twenty-one days in advance to each debtor obligated to pay the debt according to the records of the holder thereof. Acts 1975, 64th Leg., at 2354, ch. 723, § 1. As the parties to be notified by certified mail were defined only in terms of their being obligated on the indebtedness secured, rather than their ownership interest in the land, it is plain that the legislature was addressing itself to the matter of deficiency judgments. The 1983 and 1984 amendments only added the requirement that a copy of the posted notice be filed with the county clerk and held available for public inspection until after the date of sale. Acts 1983, 68th Leg., at 5056, ch. 915, § 1; Acts 1984, 68th Leg., 2d C.S., at 218, ch. 18, § 3.[13] The 1987 amendments (effective January 1, 1988) again merely added several particular requirements, generally summarized as follows: the sale must take place at the courthouse, either in the area thereof previously designated for such sales by the commissioners court or, in default of such designation, at the courthouse area designated in the notice of sale; the notice also has to state the earliest time of day at which the sale will occur and the sale must begin then or not later than three hours thereafter; in the case of "real property used as the debtor's residence," the debtor must be served by certified mail with written notice that "the debtor is in default under the deed of trust" and be given "at least 20 days to cure the default before the entire debt is due and notice of sale is given." Acts 1987, 70th Leg., ch. 540.

■ Thus Texas nonjudicial foreclosure sales of real estate under deed of trust powers have for approximately a century been conducted pursuant to a special, structured and formal statutory scheme calling for public sales between 10:00 a.m.

and 4:00 p.m. of the first Tuesday in each month preceded by three weeks' public notice. This statutory scheme, by its own terms, applies only to real property sales. The amendments to the statute in 1975, 1983–84, and 1987 preserved the basic scheme, but added specific provisions designed to enhance the fairness of the sale, the likelihood there would be public bidders, and the protection of debtors in respect to deficiency actions. These amendments were made well *after* the Texas Supreme Court's decisions in *Tarrant Savings Ass'n* and *Maupin* (and, except for the 1975 amendments, after *Musick*) which held that gross inadequacy of price (absent an irregularity in the sale contributing thereto) was not a basis on which to set aside a real estate deed of trust foreclosure, even though the creditor was the purchaser, and that if the sale were valid, the foreclosure sales price, rather than the then market price, constituted the proper amount to credit on the debt for deficiency judgment purposes, again even though the creditor was the purchaser at foreclosure. Accordingly, the Texas Legislature may be deemed to have found that the rules applied in those cases were appropriate components of a proper scheme for regulating real estate nonjudicial foreclosures, and consequent deficiency claims, which did not need to be changed except in the specific respects addressed by the amendments. *Cf. Coastal Industrial Water Authority v. Trinity Portland Cement*, 563 S.W.2d 916, 918 (Tex.1978); *Kennedy v. Hyde*, 682 S.W.2d 525, 529 (Tex.1984). Subsequent judicial abrogation of the settled rules which furnished the legal context on the basis of which the legislature may be presumed to have acted in amending the statute would constitute an unwarranted upsetting of the overall balance which the legislature struck.[14]

---

**13.** In the codification of former article 3810, as amended, into section 51.002 of the Texas Property Code, which was enacted by Acts 1983, 68th Leg., ch. 576, certain changes in arrangement or style of wording were made (for example, "public sale at auction" replaced "sale" "at public vendue"), but these changes were declared to be nonsubstantive. *Id.* § 7.

**14.** It is also to be noted in this connection that the Texas statutory system regulating most nonjudicial foreclosures of liens on personal property, as contained in the Uniform Commercial Code, initially adopted in Texas in 1965, Acts 1965, 59th Leg., ch. 721, and now codified as Title 1 of the Texas Business and Commerce Code, is plainly separate and distinct and different from the Texas statutory system regulating

The decisions of the Texas Supreme Court in *Tarrant Savings Ass'n, Maupin,* and *Musick* are decisive against appellants' claim that summary judgment should have been denied because of their tendered defense that the foreclosure sales price was only half the then market value of the property and that the property's then market value exceeded the amount of the outstanding debt.

## II

### Post–Judgment Motions

■ All the facts on which appellants' post-judgment motions were based were clearly actually known to them months before Savers' supplemental motion for summary judgment was filed on February 9, 1988, and indeed almost all such matters were known to them long before this suit was filed in April 1987.[15] Appellants were represented by counsel throughout the pendency of this action in the district court and filed an answer, a response to Savers' original motion for summary judgment and, on March 1, 1988, an additional response to Savers' supplemental motion for summary judgment. The district court did

not act on Savers' supplemental motion until April 26, 1988, at which time the last filing by any party which it had before it was appellants' March 28, 1988 letter brief. No request for continuance was made. The district court's April 26, 1988 ruling granting summary judgment was a carefully considered disposition on the merits. Final judgment was not entered until May 10, 1988. Some two weeks later, appellants' post-judgment motions were filed. Unlike the situation in the decisions relied on by appellants, such as *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396 (5th Cir.1981), the judgment here was not by default or for failure to prosecute or the like, but was rather rendered on the merits after appellants and their counsel, with full knowledge of the relevant facts and ample, unrestricted opportunity to present any contention they desired, had actually contested the case on the merits. In these circumstances, and there being no suggestion that appellants' counsel was disloyal or physically or mentally incapacitated or that appellants or their counsel lacked any notice or were misled in any way by Savers or the court, the district court did not abuse its discretion in denying the post-judgment

---

nonjudicial real estate lien foreclosures as provided in Tex.Prop.Code § 51.002 (and predecessor statutes). These Uniform Commercial Code provisions are generally contained in Tex.Bus. & Com.Code § 9.504. They are inapplicable to real estate foreclosures. *See* Tex.Bus. & Com. Code § 9.102 & official comment 4; § 9.104(10) & official comment 2; § 9.501(d). The provisions of section 9.504 omit many of the requirements contained in Tex.Prop.Code § 51.002, such as that sales must always be on a given day of the month between specified hours at a specified courthouse location, and that particular types of notice be given for a specified time in a specified manner; nor does section 9.504 require a public sale (although the secured party's right to purchase at private sale is limited). On the other hand, section 9.504 does contain a requirement, which has no counterpart in Tex. Prop.Code § 51.002, that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." Section 9.504 has been amended on several occasions. *See, e.g.,* Acts 1973, 63d Leg., at 999, ch. 400, § 5; Acts 1975, 64th Leg., at 942, ch. 353; Acts 1977, 65th Leg., at 333, ch. 163. Had the legislature, when enacting or amending section 9.504, or when amending section 51.002 in 1975, 1983, and 1987, desired to include some

requirement for commercial reasonableness in the law governing real estate nonjudicial foreclosure sales, or some restriction on the creditor's right to purchase at such sales, it would presumably have done so on one of those occasions. But it did not.

**15.** The post-judgment motions raised claims that certain correspondence from Savers to appellants in November and December 1986 and January 1987, taken together with oral conversations during that time between appellants and officers of Savers, constituted an agreement to amend the loan, or a withdrawal or waiver of demand or of the right to accelerate, or formed the basis for an estoppel preventing demand or acceleration, or rendered Savers' demand and acceleration a breach of a duty of good faith and fair dealing. These motions also asserted that in any event demand and notice of acceleration were insufficient; and that the consideration received at the trustee's sales was inadequate; and that the September 1987 sale was improper because the August 1987 sale had been rescinded. Appellants also sought to file a counterclaim against Savers based on an asserted November 1986 agreement to restructure the loan, and to join the Trust as a party in the counterclaim.

motions. *Batterton*, 783 F.2d at 1225; *Crutcher v. Aetna Life Ins. Co.*, 746 F.2d 1076, 1082–83 (5th Cir.1984).[16] *See also Nissho–Iwai American Corp.*, 845 F.2d at 1307; *Waltman*, 875 F.2d at 473–74.[17] Accordingly, appellants' complaints of the district court's ruling on their post-judgment motions present no grounds for reversal.

### Conclusion

On the basis of the case as it then stood, the district court's grant of summary judgment was proper. Moreover, there was no abuse of discretion in its denial of the post-judgment motions. Accordingly, the judgment below is

AFFIRMED.

**16.** We note that in this case, unlike *Crutcher*, appellants' post-judgment motions were filed within the time allowed by Fed.R.Civ.P. 59, computed under Fed.R.Civ.P. 6(a), and were hence to be deemed Rule 59 motions at least "for purposes of Fed.R.App.P. 4(a)(4)." *See Harcon Barge Co., Inc. v. D & G Boat Rentals, Inc.*, 784 F.2d 665, 667 (5th Cir.1986) (en banc). However, apart from Fed.R.App.P. 4(a)(4) purposes, appellants have, here and below, consistently treated their post-judgment motions as being under Fed.R.Civ.P. 60(b), both as a matter of nomenclature and as a matter of substance. Accordingly, and in light of the circumstances of this case as recited in the text, we consider the *Crutcher* case as at least strongly persuasive authority.

**17.** We do not consider that *Federal Deposit Ins. Corp. v. Castle*, 781 F.2d 1101 (5th Cir.1986),

requires a contrary result. In *Castle*, the contentions raised in the post-judgment motions had been raised in the movant's pleadings and listed as a contested issue of law in the pre-trial order. *Id.* at 1103. That is not the case here, as *none* of the matters raised in appellants' post-judgment motions had previously been raised in any fashion (except only the pure inadequacy of consideration claim, which we have fully reviewed and rejected on the merits). Further, in *Castle*, the matters raised were solely questions of substantive law which dictated rendition of judgment for the movant, and "require[d] no further factual development." *Id.* at 1105, 1108. Here that is not so, and indeed what appellants seek here, and sought below by their post-judgment motions, is simply a full-scale new trial.