United States Court of Appeals,

Fifth Circuit.

Nos. 92-5677, 92-5678.

NCNB TEXAS NATIONAL BANK, et al., Plaintiffs,

v.

Ben JOHNSON, et al., Defendants.

Fred ANDERSON, Defendant-Counter-Claimant-Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity for NCNB, Defendant-Appellee,

and

FDIC, as receiver of National Bank of Fort Sam Houston, Intervenor-Counter-Defendant-Appellee.

FEDERAL DEPOSIT INSURANCE CORP., In its Corporate Capacity, Plaintiff-Appellee,

v.

Frank J. CORTE, et al., Defendants.

Fred ANDERSON, Defendant-Counter-Claimant-Appellant,

v.

FDIC as Receiver of NCNB Texas National Bank and National Bank of Fort Sam Houston, Counter-Defendants-Appellees.

Jan. 19, 1994.

Appeals from the United States District Court for the Western District of Texas.

Before SNEED,[1] REYNALDO G. GARZA, and JOLLY, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

These cases involve a bank's suit to collect from the guarantor of a defaulting borrower. The district court granted summary judgment against the defendant guarantor. Defendant appeals.

I.

---

[1]Senior Circuit Judge of the Ninth Circuit, sitting by designation.

*FACTS*

On June 28, 1985, Quest Development, Inc. ("Quest") borrowed $1,828,000 from the National Bank of Fort Sam Houston ("Sam Houston Bank"). Quest's three shareholders were Frank Corte, Ben Johnson, and Fred Anderson. The bank obtained a security interest, evidenced by a deed of trust, in certain undeveloped land. Corte and Johnson signed a guaranty for this Quest loan. Anderson did not sign this guarantee.

On December 28, 1987, Quest borrowed $519,000 from Sam Houston Bank. On that date, Anderson signed a guaranty covering the note as well as all other indebtedness of "any kind and character" of Quest to Sam Houston Bank, which at the time included the existing outstanding balance on the $1.8 million note. The guaranty Anderson signed specified that it was to be "continuing, absolute, unconditional and unlimited as to all the indebtedness guaranteed."

On August 9, 1985, Quest borrowed an additional $700,000 from Sam Houston Bank. As part of this agreement, the bank obtained personal guaranties from Anderson, Corte, and Johnson. The bank also obtained a security interest in a mobile home park.

Subsequently, Sam Houston Bank became insolvent. The Federal Deposit Insurance Corporation ("FDIC"), as receiver, transferred the bank's assets, including the notes, deed of trust, and guaranties, to NCNB Texas National Bank ("NCNB") in late 1988.

Quest's fortunes were not much better. On August 7, 1990, Quest filed for reorganization under Chapter 11 of the United States Bankruptcy Code. Accordingly, NCNB sued Anderson, Corte, and Johnson in Texas state court to enforce the guaranty on the $1.8 million note. Johnson and Corte failed to answer the state court petition or to respond to the requests for admissions filed with the petition. As a result, the trial court entered a default judgment against Johnson and Corte and severed the judgment from the remaining claim against Anderson. NCNB filed a second state court action against the same three individuals to enforce their separate guaranties of the $700,000 note.

Anderson counterclaimed, accusing Sam Houston Bank of tying, state law fraud, and bad faith. The FDIC receiver intervened to contest Anderson's counterclaims, and removed the case to the United States District Court for the Western District of Texas. Acting in its corporate capacity,

the FDIC then purchased the Quest note and the associated guaranty from NCNB.

Upon removal, the district court adopted the state court order on the $700,000 note and entered summary judgment against Anderson. The district court then entered summary judgment against Anderson on the $1.8 million note and dismissed his counterclaims. Anderson appeals, contending that he did not guarantee the $1.8 million dollar Quest note, that the FDIC failed to prove that it owns that note, that Quest's reorganization proceeding bars any action against its guarantors, that certain modifications made to the note during Quest's reorganization were improper, and that dismissal of his counterclaim under the *D'Oench, Duhme* doctrine was in error.

Anderson's appeal from both orders have been consolidated for purposes of judicial economy since similar issues permeate both suits.[2]

## II.

### *JURISDICTION*

The district court had jurisdiction through 12 U.S.C. § 1819(b)(2) (Supp.IV 1992), which allows the FDIC to remove any suit to federal court within ninety days of becoming a party to that suit. The FDIC may invoke section 1819(b)(2) removal even where, as here, the state court has already entered judgment. *Matter of Meyerland Co.,* 960 F.2d 512, 516-19 (5th Cir.1992) (en banc), *cert. denied,* --- U.S. ----, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993). This court has appellate jurisdiction under 28 U.S.C. § 1291 (1988).

At the outset, Anderson raises three challenges to our appellate jurisdiction. All three are without merit. First, Anderson notes that the district court's order of summary judgment on the $700,000 note names him, but not the other guarantors. He argues that the district court order is thus not "final" because it does not dispose of all the parties to the suit. However, the district court's order also expressly incorporates the order entered by the state court, which names all three defendants. The district court's subsequent reference to Anderson alone, while somewhat unusual, is fully

---

[2]In this regard, certain documents relevant to each case are included in the record of its respective companion case. We take judicial notice of such documents as official public records on file with this circuit. *United States v. Hawkins,* 566 F.2d 1006, 1008 n. 2 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978).

consistent with the guaranty agreement and with the state court judgment, which both provide for joint and several liability among the coguarantors.[3]

Anderson next argues that the district court, in granting partial summary judgment on the $700,000 note, failed to properly credit him for rental income allegedly received by NCNB from Quest's collateral, and for new collateral obtained by NCNB as part of Quest's reorganization. He contends that the order fails to dispose of all the issues in the suit, and is therefore not final. This argument merely restates Anderson's arguments on the merits. In granting summary judgment, the state and district courts implicitly rejected Anderson's contentions, thereby disposing of these issues and making the judgment final.[4]

Finally, Anderson asserts that the district court could not enter summary judgment on the $700,000 note because no motion for summary judgment was made. His discussion on this point, however, merely contests the merits of the district court's decision, and does not go to jurisdiction. In any event, the district court complied with this circuit's procedure for claims removed by the FDIC after a state court renders judgment: namely, "the district court [should] take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to a federal appellate court for review." *Meyerland,* 960 F.2d at 520. NCNB moved for and obtained summary judgment in state court. There was no need for it, or for its successor, the FDIC, to renew the motion upon removal to federal court. "A case removed from state court simply comes into the federal system in the same condition in which it left the state system." *Id.* Judicial economy is promoted by allowing for proceedings initiating in state court to have full force and effect in federal court, so that pleadings filed in state court need not be duplicated upon removal. *Id.*

### III.

---

[3]For the same reason, Anderson's claim that the district court unconstitutionally singled him out for disparate treatment also fails. A guarantor who pays more than his fair share of a debt may, of course, seek contribution from his coguarantors.

[4]Likewise, we reject Anderson's argument that the district court's order of summary judgment on the $1.8 million note fails to discuss his coguarantors' liability for costs and prejudgment interest. The district court's order denies all relief not expressly granted, thereby disposing of those issues. The FDIC has chosen not to appeal that aspect of the district court's decision.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *FDIC v. Selaiden Builders, Inc.,* 973 F.2d 1249, 1253 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1944, 123 L.Ed.2d 650 (1993). Summary judgment is appropriate if the movant demonstrates that there are no genuine issues of material fact. *Id.* This court has observed that "suits on promissory notes provide fit grist for the summary judgment mill." *Id.*

## IV.

## DISCUSSION

In order to recover on the guaranties, the FDIC must establish that: (1) the defendant signed the guaranty agreement; (2) the FDIC-Receiver is the present holder or owner of the note; and (3) the note is in default. *Selaiden Builders,* 973 F.2d at 1254.

### A. Did Anderson Guarantee the $1.8 Million Quest Note?

The initial contention of the guarantor is that he did not sign a guaranty for the $1.8 million note and that he is thus not liable as a guarantor for that note. He asserts that the 1987 guaranty agreement contemplated that the guaranty would extend and apply only to the 1987 transaction involving the $519,000 loan. This argument is unpersuasive; the language of the instrument belies such a contention. The guaranty, although issued in conjunction with a different debt, expressly covers "*all* other indebtedness of any kind and character" of Quest to Sam Houston Bank. It thus encompasses Quest's $1.8 million note to Sam Houston. *See FDIC v. Cardinal Oil Well Servicing Co., Inc.,* 837 F.2d 1369, 1371 (5th Cir.1988) (enforcing similar all-indebtedness guaranty according to its unequivocal terms). In the face of such explicit and unequivocal language, free of any ambiguity, we may not look to extraneous evidence of intent. *Id.*

Examining the language of the agreement, we find nothing to indicate that the guaranty was limited to a single note transaction. The guarantor is liable under the express terms of the agreement he signed.

### B. Did the FDIC Prove that It Owned the Quest Note?

As previously discussed, the FDIC obtained the Quest note from NCNB, which in turn

acquired it from the FDIC receiver for Sam Houston Bank, the original lender. Anderson argues that the purchase agreement transferring the note from the FDIC receiver to NCNB only refers to "certain assets" of the failed Sam Houston Bank. He contends that, as a result of this alleged defect in the chain of ownership, the FDIC failed to show that it was the present owner and holder of the note.

Mere possession of a note payable to another does not suffice to show ownership. *Resolution Trust Corp. v. Camp,* 965 F.2d 25, 29 (5th Cir.1992). It is also true that, standing alone, a purchase agreement covering unspecified assets does not establish ownership. *See McCrary,* 977 F.2d at 195. Generally, however, the affidavit of a custodian of records is sufficient proof, unless the defendant points to evidence in the record supporting a legitimate fear that the plaintiff is not the owner and holder of the note, and that some other part y will later appear and demand payment. *FDIC v. McCrary,* 977 F.2d 192, 194 (5th Cir.1992).

In *McCrary,* the FDIC receiver conveyed certain unnamed assets of a failed bank to a second bank, and conveyed certain other unnamed assets to the FDIC acting in its corporate capacity. *Id.* The court found that the potentially overlapping agreements created a factual issue as to ownership, and reversed the district court's grant of summary judgment. *Id.*

Here, however, the agreement between the FDIC and NCNB expressly covers all of Sam Houston's loans. Unlike *McCrary,* Anderson has not pointed to a second conflicting agreement that would raise a question as to ownership. Moreover, the FDIC has produced substantial record evidence that it owns the Quest note. In addition to the affidavit of the FDIC's custodian, the record contains (1) the original note between Quest and Sam Houst on Bank with indorsements from the FDIC receiver to NCNB and from NCNB back to the FDIC[5]; (2) the Office of the Comptroller of Currency's declaration of Sam Houston Bank's insolvency and its appointment of the FDIC as receiver; and (3) the purchase agreement from the FDIC receiver to NCNB, which expressly covers "all right, title and interest ... in ... [l]oans [and] any other asset" excluding certain tort claims and fixed assets. In light of this evidence, the FDIC has offered sufficient proof that it is the owner and

---

[5]The custodial affidavit and the indorsements are included in the record of the case. We take judicial notice of official public records on file with this court. *Hawkins,* 566 F.2d at 1008 n. 2.

holder of the Quest note. Because the appellant failed to point to anything in the record to establish their legitimate fear that the FDIC was not the true owner, and that some entity other than the FDIC owns and holds the note, summary judgment was appropriate.

*C. Does Quest's Plan of Reorganization Bar NCNB's Suit Against Quest's Guarantors?*

Quest, the original debtor, entered Chapter 11 reorganization proceedings on August 7, 1990. During reorganization, NCNB obtained relief from the bankruptcy court's automatic stay, allowing it to sell the land securing Quest's note. On August 7, 1991, the bankruptcy court confirmed Quest's plan of reorganization, which rolled the remaining unpaid balance on the Quest note into a new promissory note. The plan specifically preserves NCNB's right to pursue Quest's guarantors.

Nevertheless, Anderson contends that the confirmed plan of reorganization bars the FDIC's suit against him, under principles of res judicata and accord and satisfaction. He attempts to persuade this court that there is no deficiency on the notes since the reorganization plan expressly provides that the Quest loans will be fully repaid. This argument lacks merit. The discharge of a debtor in reorganization proceedings does not affect a guarantor's liability. *United States v. Stribling Flying Serv., Inc.,* 734 F.2d 221, 223 (5th Cir.1984) (citing 11 U.S.C. § 524(e)). In *Stribling,* the guarantors similarly argued that their obligations as guarantors were terminated by the Chapter 11 proceeding in that the confirmation of the plan cured the default on the note, leaving them liable only on the reduced debt, and that the confirmation order acted as collateral estoppel or res judicata as to a claim against the guarantor on the original debt. *Id.* This court stated that the central fallacy of this analysis is that it fails to consider section 524(e) of the Bankruptcy Code. *Id.* Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." *Id.*

Similarly, in *R.I.D.C. Indus. Dev. Fund v. Snyder,* 539 F.2d 487, 494 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977), we rejected arguments (similar to those presently made) by the guarantors of a corporate debt that was modified in Chapter XI proceedings, holding that the reorganization plan did not affect the responsibility of the guarantors to fulfil their obligation on the unpaid portion of the guaranteed debt that remained after the plan was

completed. Anderson's theory would defeat the purpose of loan guaranties; after all, a lender obtains guaranties specifically to provide an alternative source of repayment in the event that the primary obligor's debt is discharged in bankruptcy. *See R.I.D.C.,* 539 F.2d at 491. Accordingly, the Bankruptcy Code provides that discharge in bankruptcy will not alter the liability of guarantors. 11 U.S.C. § 524(e).

Further, there has been no accord and satisfaction, simply because there has been no accord. Reorganization proceedings are judicial, not contractual, even where a secured creditor voluntarily participates. *See R.I.D.C.,* 539 F.2d at 492-94.

*D. Does the Modification of the Quest Note During Reorganization Release Quest's Guarantors?*

On a similar note, Anderson argues that modifications made to the Quest note during reorganization, namely the sale of the collateral with a transfer of all of the remaining principal balance to a new note, were made without his written consent. He contends that such modifications constitute a breach of his guaranty agreement and thus release him from liability. Alternatively, he argues that the sale of Quest's collateral was not commercially reasonable, and that he should be credited for value in excess of the sale price.

The express terms of Anderson's guaranty foreclose the first argument. Where a guaranty's terms are plain and unambiguous, this court will enforce the guaranty according to those terms. *See FDIC v. Nobles,* 901 F.2d 477, 480 (5th Cir.1990) (upholding guaranty that waived lender's duty to preserve collateral). The guarantors here plainly waived "notice of extensions, renewals or rearrangements of Debt, [notice] of release or substitution of collateral, ... and every other notice of every kind."

Anderson points out that the deed of trust associated with the $700,000 Quest note only allows modification of the loan instruments, including the guaranties, "by a written instrument ... executed by the party against which enforcement of the modification ... is asserted." However, the specific terms of the guaranty control the general terms in the deed of trust. Moreover, the FDIC is not trying to enforce the modified note against Anderson; rather, it is trying to collect the deficiency on Quest's "original" note.

Anderson's commercial reasonableness defense is slightly more complex. As previously discussed, NCNB sold the land securing the Quest note during Quest's reorganization. NCNB, as high bidder, obtained the property for $259,544.37, which was credited against the debt in determining the guarantors' liability. Anderson argues that the sale was not commercially reasonable because the property was sold for less than its appraised value of $600,000.

Anderson relies on the Texas version of the Uniform Commercial Code, which does not apply to land sales. *See Savers Federal Sav. & Loan Ass'n v. Reetz,* 888 F.2d 1497, 1507-08 n. 14 (5th Cir.1989) (noting that Texas real property code requires several detailed foreclosure procedures, but does not require general commercial reasonableness). Meanwhile, the FDIC claims that Anderson waived his right to commercially reasonable foreclosure in his guaranty. While the guarantors did waive virtually all other interests in the collateral, the waiver in the guaranty does not expressly discuss commercially reasonableness, and in fact incorporates Texas law. *See United States v. Terrey,* 554 F.2d 685, 692-93 (5th Cir.1977) (finding that a guarantor did not waive his commercial reasonableness defense despite giving lender full power to dispose of collateral, where guaranty expressly incorporated Texas law).

Nevertheless, Anderson's argument still lacks merit. Where there has been a valid nonjudicial deed of trust foreclosure on real property, the amount to be credited on the related debt is the amount received at the foreclosure sale. *Savers,* 888 F.2d at 1503. Inadequacy of the amount received cannot alone invalidate an otherwise valid foreclosure, even where the creditor is also the purchaser; rather, there must be some irregularity in the foreclosure procedure. *Id.*[6] Anderson's only objections to the foreclosure in this case are that the property was sold for less than its appraised value, and that NCNB, the creditor, was the purchaser. Neither is sufficient to invalidate NCNB's foreclosure.[7]

---

[6]After the *Savers* decision, the Texas legislature amended the state property code so that a court, upon motion, could determine the fair market value of foreclosed property. *See* Tex.Prop.Code Ann. §§ 51.003-51.004 (West Supp.1993). This amendment, however, only applies to sales conducted after April 1, 1991. *See id.* historical and statutory note. The sale in this case took place in November, 1990.

[7]Anderson also challenges the commercial reasonableness of the sale of collateral securing the $1.8 million Quest note. The amount credited to this note was not the foreclosure price, but an amount stipulated by Quest and NCNB during Quest's reorganization. The stipulated amount,

*E. Does the D'Oench, Duhme Doctrine Bar Anderson's Counterclaims?*

In response to NCNB's suit, Anderson asserted several counterclaims, including violation of anti-tying provisions of the Bank Holding Act and state law fraud. The district court found that Anderson's counterclaims were barred by the *D'Oench, Duhme* doctrine.[8] So does this court.

The common law *D'Oench, Duhme* doctrine is designed to protect the FDIC's interest in assets it acquires as the receiver for failed banks. *See, e.g., Beighley v. FDIC,* 868 F.2d 776, 783-84 (5th Cir.1989). Specifically, it bars defenses and claims by borrowers based on unrecorded agreements with the failed bank. *See, e.g., NCNB Texas Nat'l Bank v. King,* 964 F.2d 1468, 1470 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 2305, 119 L.Ed.2d 226 (1992). In this case, *D'Oench, Duhme* also protects NCNB and the FDIC corporate entity as assignees of the FDIC receiver. *See id.* Defenses that are framed as causes of action are likewise barred. *Id.*

The test for application of the *D'Oench, Duhme* doctrine is whether the borrower "lent himself to a scheme or arrangement" whereby banking authorities are likely to be misled. *Beighley,* 868 F.2d at 784.

Anderson contends that he has established a Bank Tying Act claim and that it is not barred by the *D'Oench, Duhme* doctrine. Anderson claims that Sam Houston Bank tied a $519,000 bridge loan to Quest to the demand that Quest use part of the bridge loan proceeds to pay on the default loans of several related entities.[9]

---

however, was well in excess of the foreclosure sale price, giving Anderson more credit than was his due under Texas law. Absent allegations of procedural irregularity in the underlying foreclosure, we will not allow Anderson to look his own gift horse in the mouth.

[8]The district court dismissed Anderson's counterclaims for bad faith, unfair dealing, and emotional distress on the grounds that Texas law does not provide a cause of action for such claims. On appeal, Anderson only challenges the district court's *D'Oench, Duhme* holding.

[9]The applicable entities were Bulldog Manufacturing Co. and Fiber Products, Inc. Both entities were owned by Pioneer Home Builders, Inc., which was in turn owned by Frank Corte and Ben Johnson. Corte, Johnson, and Anderson owned Quest.

Quest also agreed to use a portion of the 1987 loan proceeds to repay part of a debt owed by Phillip Parks, Quest's vice president and secretary, and two other individuals.

Additionally, the bank demanded that with the sale of 8.8 acres of land, Quest had

In order to prevail under the Bank Holding Company Act, 12 U.S.C. § 1972 (1989),[10] the plaintiff must show: (1) the banking practice in question was unusual in the banking industry; (2) an anti-competitive tying arrangement existed; and (3) the bank benefitted from the practice. *Bieber v. State Bank of Terry,* 928 F.2d 328, 330 (9th Cir.1991). In such suits, this circuit has held it to be sufficient to merely allege that the required act was an unusual banking practice; the benefit to the bank will be presumed. *Swerdloff v. Miami Nat. Bank,* 584 F.2d 54, 59 (5th Cir.1978).

In order to survive summary judgment, Anderson must present evidence sufficient to create a fact issue regarding whether the conditions placed on the loan were unusual in the banking industry. *Gulf States Land & Dev., Inc. v. Premier Bank N.A.,* 956 F.2d 502, 506-07 (5th Cir.1992). In support of his anti-tying claim, Anderson points only to terms in the $519,000 Quest note providing for the use of some of the proceeds of that loan to repay other outstanding obligations of related entities. However, Anderson offers nothing beyond the facially-neutral provisions of a note which the FDIC did not even seek to enforce which would have put the FDIC on notice that Sam Houston Bank engaged in anything more that traditional banking practice with respect to his guaranty or any of the Quest transactions. *See Bieber,* 928 F.2d at 330 (holding it not unusual banking practice to tie continuance of loan to guarantee of separate customer). Accordingly, Anderson's anti-tying claim is similarly defeated by the absence of anything in the Bank's records reflecting a violation of the law. *King,* 964 F.2d at 1471.

On its face, the language on the agreement appears to be a mere restructuring of affiliated debts. *See id.* (rejecting tying claim based on restructuring of debts and properties among related

---

to place funds in escrow to pay the Bulldog Manufacturing Co., Fiber Products, Inc. and Park, Dimmick & McClaugherty notes.

[10]The applicable provision of 12 U.S.C. § 1972 (1989) are as follows:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service....

entities and individuals). Proof of the bank's "tying," if tying did occur, would require evidence of terms or agreements outside of the face of the document—just the sort of inquiry that *D'Oench, Duhme* does not allow. *See King,* 964 F.2d at 1470 (finding that *D'Oench, Duhme* barred tying claim based on unrecorded agreements).[11]

Anderson's fraud claim stems from certain misrepresentations allegedly made by Sam Houston Bank in order to induce Anderson to sign the guaranty.[12] *D'Oench, Duhme* also bars this claim. Misrepresentations are not a defense to recovery by the FDIC on facially unqualified loan documents. *See Cardinal Oil Well Servicing Co.,* 837 F.2d at 1372 (barring guarantor's defense of fraudulent inducement under *D'Oench, Duhme* and its statutory counterpart, 12 U.S.C. § 1823(e)).

Anderson argues that Sam Houston Bank misrepresented that the Quest notes would not be modified without his consent. He relies on the deed of trust, which only allows modification of the loan instruments "by a written instrument ... executed by the party against which enforcement of the modification ... is asserted." He contends that Sam Houston's alleged misrepresentation was recorded in that provision and is therefore not barred under *D'Oench, Duhme.* However, Anderson's guaranty plainly waived all rights to notice of modifications. On the face of the agreements, the specific terms of the guaranty control the general terms in the deed of trust. Any representation to the contrary by Sam Houston Bank, if it was made, was not recorded and is therefore barred.

*F. Was the District Court's Award of Attorney Fees Proper?*

As part of the guaranty, the guarantors "agree[d] to pay reasonable attorney's fees and other collection costs" incurred by the lender. Accordingly, the FDIC petitioned the district court for attorney's fees on September 14, 1992, providing detailed summaries, copies of individual expense items, and supporting affidavits. The district court granted the FDIC's request on October 5, 1992.

---

[11]Anderson also argues that NCNB "tied" by requiring Quest to assume a $200,000 debt owed by Phillip Parks, Quest's vice president and secretary, and to transfer certain Quest property, which had served as collateral for the Parks note, as part of its reorganization plan. Again, this appears to be a perfectly normal restructuring of debt during reorganization, not tying.

[12]Anderson also contends that NCNB committed fraud by using his 1987 guaranty to hold him liable for the 1985 Quest note. As discussed above, NCNB is merely enforcing the 1987 guaranty according to its own express terms.

Anderson challenges the fee award as unreasonable. He contends that the fees were excessive, asserting that the FDIC and NCNB's efforts in this case merely duplicated their collection efforts on a second Anderson guaranty, and that "[l]ittle actual activity occurred" in this companion case.

In response, the FDIC first argues that this court lacks appellate jurisdiction over the fee award. In the alternative, the FDIC contends that its fees were reasonable.

The FDIC notes that Anderson's notice of appeal, filed several days before the October 5, 1992 fee order, refers only to the district court's order on the merits, without mentioning attorney's fees or the district court's fee order. For his part, Anderson observes that his notice of appeal broadly designates "the judgments and orders entered in this action including the order" on the merits, thereby encompassing the fee order.

Federal Rule of Appellate Procedure 3(c) requires, among other things, that a notice of appeal "designate the judgment, order or part thereof appealed from." In general, this court liberally construes a notice "where the intent to appeal an unmentioned ... ruling is apparent and there is no prejudice to the adverse party." *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1056 (5th Cir. July), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981). However, the intent to appeal must be clear, or the appeal must involve issues "inextricably entwined" with issues that have been properly raised. *Id.* In *Quave v. Progress Marine,* 912 F.2d 798, 801 (5th Cir.1990), *cert. denied,* --- U.S. ----, 111 S.Ct. 2012, 114 L.Ed.2d 99 (1991), this court held that it lacked jurisdiction to decide a challenge to a fee award because the notice of appeal, filed "several weeks before the judgment awarding attorney's fees was entered ... ma[de] no reference to attorney's fees."

Strictly speaking, Anderson's notice of appeal did not, and could not, designate an order that did not then exist. *See Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1205 (6th Cir.1984) (dismissing plaintiff's argument that fee award was inadequate, because plaintiff filed notice of appeal before even moving for fees). Likewise, no intent to appeal could exist, much less be apparent, because the order had not been granted. *See Warfield v. Fidelity & Deposit Co.,* 904 F.2d 322, 326

(5th Cir.1990). And, as in *Quave,* the notice in this case makes no mention of attorney's fees. Therefore, we need not reach the issue of reasonableness.

## V.

## *CONCLUSION*

For the foregoing reasons, the district court's grant of summary judgment in favor of the FDIC, and its dismissal of Anderson's counterclaims, is AFFIRMED.

. . . . .