IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2007 Session

## J & B INVESTMENTS, LLC v. TARUN N. SURTI, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 03-2147-I     Claudia Bonnyman, Chancellor**

_____

**No. M2006-00923-COA-R3-CV - Filed December 27, 2007**

_____

Three guarantors of a promissory note appeal the Chancery Court's decision to hold them liable for the deficiency owing on the note, including interest at the default rate of 24%, following the discharge in bankruptcy of the original debtor. After the debtor defaulted on the $1,500,000 promissory note, the debtor filed for Petition for Relief under Chapter 11 in Bankruptcy Court. The Bankruptcy Court approved the debtor's plan of reorganization after declaring that the Allowed Claim Amount would be based upon the original interest rate of 8.5%, not the default rate of 24%. In the interim, the holder of the promissory note filed this action to collect a deficiency on the indebtedness, specifically the difference between the default rate of 24% and the original interest rate of 8.5%. The Chancellor ruled by summary judgment that the plaintiff was entitled to collect the deficiency on the indebtedness against the Guarantors, the deficiency being the difference in the interest rates. Following the debtor's discharge in bankruptcy, the guarantors filed a Tenn. R. Civ. P. 60.02(4) motion contending the indebtedness owing to the plaintiff was satisfied pursuant to the Plan of Reorganization. The Chancellor denied the motion and awarded the holder of the note prejudgment and post-judgment interest at the default rate of 24%, and attorney fees incurred in this and a separate action. The guarantors appealed contending the Chancellor erred in denying their Rule 60 motion, finding the default rate of 24% to be legal, and awarding interest at the default rate prior to notice of default. The guarantors also contended it was error to award the plaintiff attorney fees for services rendered in a separate action. We have determined the debtor's bankruptcy does not affect the liability of the guarantors and thus does not impair the plaintiff's right to recover the deficiency. We have also determined the default rate of 24% was not usurious, and the holder of the note was not required to give notice of default to invoke the default rate. Further, we have determined the holder of the note was only entitled to recover attorney fees incurred to enforce the Guaranty Agreements, not to defend related actions that do not pertain to the Guaranty Agreements.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Donald N. Capparella and Mathew R. Zenner Nashville, Tennessee, for the appellants, Tarun N. Surti, Lata Surti, and Arte Corporation, Inc.

Sam J. McAllester, III, and William J. Haynes, III, Nashville, Tennessee, for the appellee, J & B Investments, LLC.

## OPINION

On July 2, 1997, Foster Business Park, LLC, and The Bank of Nashville entered into a Construction and Term Loan Agreement ("Loan Agreement"). Pursuant to the Loan Agreement, The Bank of Nashville made a loan to Foster Business Park as evidenced by a Promissory Note ("Note") in a principal amount not to exceed One Million Five Hundred Thousand Dollars ($1,500,000).[1] The Note was secured by a Deed of Trust on a parcel of property, a Security Agreement and Assignment of Rents and Leases, Fixture Filing, and Guaranty Agreements. The Guaranty Agreements were executed by Tarun Surti, his wife Lata Surti, and Arte Corporation, Inc. (hereinafter the "Guarantors"). The Guaranty Agreements obligated the Guarantors to satisfy the obligation under the Loan Agreement and Note in the event of default by Foster Business Park.

The scheduled maturity date of the Note was December 20, 2002. The holder of the Note, however, had the right to accelerate the maturity date in the event of the existence or occurrence of any default, one of which was the failure to pay principal or interest when due. Foster Business Park failed to pay the principal and interest due on September 20, 2002, which constituted an event of default. The Note also provided in relevant part that the holder was entitled to recover interest on the principal owed at the default rate of 24% per annum.

On March 24, 2003, The Bank of Nashville assigned the Note, the Loan Agreements and the Guaranty Agreements (hereinafter collectively the "Loan") to American Holding Investments, Inc. Four months later, American Holdings Investments, Inc., sold and assigned the Loan to J&B Investments, L.L.C., ("Plaintiff"), which remains the holder of the Note and Guaranty Agreements.

Foster Business Park never cured the default that occurred when it failed to pay the principal and interest due on September 20, 2002. Moreover, the Guarantors failed to cure the default or to otherwise remit any payments to Plaintiff, or its predecessors in interest, due on the Note as required of them pursuant to the Guaranty Agreements. Seeking relief from its obligations on the Note, the debtor, Foster Business Park, filed a petition for Chapter 11 relief in the United States Bankruptcy Court in May of 2003. Thereafter, on July 25, 2003, while Foster Business Park's bankruptcy was pending, Plaintiff filed this action against the Guarantors in the Chancery Court for Davidson County. Eight months later, on the motion of Plaintiff, the Chancellor awarded Plaintiff summary judgment against the Guarantors ruling that Plaintiff "shall have and recover a judgment against the [Guarantors] for the unpaid principal balance plus accrued and unpaid interest . . . ." The order went on to provide that Plaintiff shall submit a motion "to determine the amount due with supporting affidavits in accordance with the Rules of Civil Procedure so that an exact amount due can be determined." Accordingly, as of March 25, 2004, the Chancery Court had determined that Plaintiff

---

[1] On January 16, 1998, and again on March 23, 2000, Foster executed a Change in Terms Agreement with respect to the Promissory Note.

was entitled to recover the unpaid principal balance plus interest on the Note; however, the amount owing was to be determined at a later hearing.

While the Chancery Court action against the Guarantors was pending, Foster Business Park was pursing the petition for Chapter 11 relief in the United States Bankruptcy Court for the Middle District of Tennessee it had filed in May of 2003. In July of 2003, following Plaintiff's acquisition of the Loan, Plaintiff filed its Proof of Claim in the bankruptcy court seeking to recover the unpaid principal balance on the Note, plus accrued interest at the default rate. Thereafter, in February of 2004, Foster Business Park filed its first Plan of Reorganization. During the hearing to consider the plan, the bankruptcy court advised the parties that it would apply Section 1124 of the Bankruptcy Code (11 U.S.C. § 524(e)), which allows the court to calculate a "claim amount" based on the original rate of interest instead of an elevated default rate, notwithstanding the contractual right of a creditor to accelerate the maturity date to invoke a higher rate for default. As a consequence of the court's decision to apply Section 1124, Foster Business Park filed an Amended Plan of Reorganization which calculated Plaintiff's bankruptcy claim at the reduced, pre-default interest rate of 8.5% per annum and provided for "full payment" of the "Allowed Claim Amount." In pertinent part, the Amended Plan stated:

> [Plaintiff] shall be paid an amount sufficient to cure the default of the effective date of the plan, *by paying the principal balance of the obligation held by [Plaintiff] plus unpaid interest at the pre-default, contract interest rate of 8.5 percent per annum*, plus reasonable costs and attorney's fees. . . . This payment shall be in full satisfaction of the obligation owed to [Plaintiff]. (emphasis added)

The Plan made no mention of the Guaranty Agreements at issue here, nor did the Plan contain any provision releasing any of the Guarantors from their respective obligations under the Guaranty Agreements.

After conducting a hearing, the bankruptcy court entered an order confirming the amended plan on August 3, 2004. In its findings of fact and conclusions of law, the bankruptcy court approved the Chapter 11 Plan setting Plaintiff's claim against Foster Business Park at $1,502,037.29, as of September 14, 2004, the scheduled Effective Date of the Plan. In furtherance of the plan as approved by the bankruptcy court, Foster Business Park presented $1,502,037.29 to Plaintiff on September 8, 2004, thereby consummating the Plan. As a consequence, Foster Business Park was relieved of its indebtedness to Plaintiff on the Loan.

Thereafter, Plaintiff focused its attention on the Guarantors in the Chancery Court proceedings seeking to recover the deficiency it claimed to be owing on the Loan, that being the difference between the original interest rate of 8.5% and the default rate of 24%. The Guarantors, however, were seeking to be relieved of the Summary Judgment the Chancery Court had entered in March of 2004. In furtherance of this effort, the Guarantors filed a Rule 60 Motion for Relief from the summary judgment contending that Foster Business Park's "full satisfaction" of Plaintiff's bankruptcy claim against it relieved the Guarantors from further liability under the Guaranty Agreements. The Chancellor disagreed and denied the Rule 60 motion.

Plaintiff then filed a motion to set the amount of the judgment, as the Chancellor had instructed in the order granting Plaintiff summary judgment. In the motion, Plaintiff set forth a calculation of the sum the Guarantors allegedly owed, giving full credit for the $1,502,037.29 collected from Foster Business Park in the bankruptcy proceedings. The judgment sought by Plaintiff included: (1) the unpaid accrued interest at the default rate from the date of default, September 20, 2002, to the entry of the Judgment; (2) accrued post-judgment interest at the default rate from the entry of Judgment through the date the Bankruptcy Allowed Claim Amount was paid; (3) an offset of the Bankruptcy Allowed Claim Amount; (4) post-judgment interest accruing on the judgment at the default rate from the date the Bankruptcy Allowed Claim Amount was paid through the date of the Judgment; and (5) attorney's fees.

Following a hearing on the motion, the Chancellor awarded Plaintiff $414,390.48 for the accrued and unpaid interest from December 20, 2002 to August 15, 2005, and post-judgment interest at the default rate of 24% per annum. As for its attorney fee request, the Chancellor ordered Plaintiff to file a separate application for attorney's fees.

As directed, Plaintiff filed an application for attorney's fees. Following a hearing, the Chancellor awarded Plaintiff attorney's fees in the amount of $52,834.17 for fees incurred in this action from July 28, 2004 through December 31, 2005. In addition thereto, the Chancellor awarded Plaintiff its attorney's fees incurred in a separate action, wherein Foster Business Park had sued Plaintiff and The Bank of Nashville claiming that the 24% interest rate was usurious and thus unlawful (hereinafter the "Usury Action"). This appeal followed.

## ANALYSIS

The guarantors contend the Chancellor erred in denying their Rule 60 motion for relief. They contend the default rate of 24% legal is an illegal rate and, if not illegal, that the court erred in awarding the default rate for the period prior to the holder giving notice that it was invoking the default provisions. Finally, the Guarantors contend the Chancellor erred in awarding attorney fees for services rendered in a separate action.

## Tenn. R. Civ. P. 60.02(4) Motion

We will first consider the Guarantors' contention that the Chancellor erred in denying their Tenn. R. Civ. P. 60.02 request for relief from the 2004 Summary Judgment. In the 2004 Order, the Chancellor ruled that Plaintiff "shall have and recover a judgment against the [Guarantors] for the unpaid principal balance plus accrued and unpaid interest . . . without set-off . . . ." In their Rule 60 motion, the Guarantors contend the "judgment against [the Guarantors] has been satisfied as part of Foster Business Park's Chapter 11 Plan." They also contend that the applicable interest rate to be applied to the judgment "was litigated in the Bankruptcy proceeding" and it was determined "that the proper interest rate was 8.5%." They further contend that Foster Business Park "satisfied" their obligations with the payment of $1,502,037.29 in the bankruptcy proceeding. Upon these facts the Guarantors contended they were entitled under Rule 60.02(4) to an "order stating that the Summary Judgment has been satisfied in full."

-4-

Tenn. R. Civ. P. 60.02 provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: . . . (4) *the judgment has been satisfied, released or discharged*, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. . . . A motion under this Rule 60.02 does not affect the finality of a judgment or suspend its operation, but the court may enter an order suspending the operation of the judgment upon such terms as to bond and notice as to it shall seem proper pending the hearing of such motion. . . . (emphasis added).

A motion for relief based on Rule 60.02 grounds addresses itself to the sound discretion of the trial judge, and the scope of review of an appellate court is to determine if that discretion was abused. *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993). Thus, the party seeking relief from a judgment bears a heavy burden, unless the denial of Rule 60.02 relief was solely based upon legal issues in which event our review is conducted under the *de novo* standard of review. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 137 (Tenn. Ct. App. 1995).

The Chancellor denied the Rule 60.02(4) motion, stating Plaintiff's contractual rights to which they are entitled were not altered by the Bankruptcy Court proceedings. The Chancellor's ruling was based in part on 11 U.S.C. §524(e) of the bankruptcy code. Section 524(e) of the bankruptcy code explicitly states that "the discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The United States Court of Appeals for the Fifth Circuit provided an in-depth analysis of this issue in *NCNB Texas Nat. Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994):

[The guarantor] contends that the confirmed plan of reorganization bars the FDIC's suit against him, under principles of res judicata and accord and satisfaction. He attempts to persuade this court that there is no deficiency on the notes since the reorganization plan expressly provides that the Quest loans will be fully repaid. This argument lacks merit. The discharge of a debtor in reorganization proceedings does not affect a guarantor's liability. *United States v. Stribling Flying Serv., Inc.*, 734 F.2d 221, 223 (5th Cir.1984) (citing 11 U.S.C. § 524(e)). In *Stribling*, the guarantors similarly argued that their obligations as guarantors were terminated by the Chapter 11 proceeding in that the confirmation of the plan cured the default on the note, leaving them liable only on the reduced debt, and that the confirmation order acted as collateral estoppel or res judicata as to a claim against the guarantor on the original debt. *Id.* This court stated that the central fallacy of this analysis is that it fails to consider section 524(e) of the Bankruptcy Code. *Id.* Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." *Id.*

Similarly, in *R.I.D.C. Indus. Dev. Fund v. Snyder*, 539 F.2d 487, 494 (5th Cir.1976), cert. denied, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977), we rejected arguments (similar to those presently made) by the guarantors of a corporate debt that was modified in Chapter XI proceedings, holding that the reorganization plan did not affect the responsibility of the guarantors to fulfil their obligation on the unpaid portion of the guaranteed debt that remained after the plan was completed. [The guarantor]'s theory would defeat the purpose of loan guaranties; after all, a lender obtains guaranties specifically to provide an alternative source of repayment in the event that the primary obligor's debt is discharged in bankruptcy. *See R.I.D.C.*, 539 F.2d at 491. Accordingly, the Bankruptcy Code provides that discharge in bankruptcy will not alter the liability of guarantors. 11 U.S.C. § 524(e).

*NCNB Texas Nat. Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994).[2] Accordingly, the discharge of Foster Business Park in bankruptcy did not alter the liability of the Guarantors.

In an effort to escape the plain meaning of 11 U.S.C. § 524(e), the Guarantors rely upon this court's opinion in *Cumberland Bank v. G&S Implement Co., Inc., et al.*, 211 S.W.3d 223 (Tenn. Ct. App. 2006) to pursue their contention that they were released from liability as the result of the "full satisfaction" of the Bankruptcy Allowed Claim Amount by Foster Business Park. We, however, find the Guarantors' reliance on *Cumberland Bank* misplaced. This is because the facts are distinguishable.

The creditor in *Cumberland Bank* filed suit against a co-guarantor (Dickerson) of a corporate debt to enforce the provisions of the guaranty agreement. While Dickerson was battling with the creditor, his co-guarantors (the Kingreys) filed a Chapter 11 petition, wherein the Kingreys filed a Plan of Reorganization in which they proposed to execute a supplemental note that refinanced the corporate debt "in full." The Bankruptcy Court subsequently approved the plan and afforded the Kingreys several months to obtain "refinancing" to comply with the plan, and if they failed to do so, they would remain liable on the guaranty. *Id*. at 226. The Kingreys did as the court instructed and the significance of the refinancing is explained in the opinion as follows:

The bankruptcy court's order required the Kingreys to "obtain refinancing" within nineteen months to pay the unpaid balance of the 1996 note "in full." In the context of bankruptcy proceedings, the word "refinancing" is a term of art. It connotes a transaction that substitutes one debt for another. *In re Biondo*, 180 F.3d 126, 132-33 (4th Cir. 1999); *In re Kielur*, 323 B.R. 910, 915 (Bankr. W.D. Pa. 2005); *In re Sheppard*, 299 B.R. 753, 761 (Bankr. E.D. Pa. 2003). Accordingly, the Kingreys could not comply with the bankruptcy court's order by simply renewing the existing note. *The bankruptcy court envisioned that they would replace this existing debt with a new one*.

---

[2] In the reorganization plan in *Johnson*, the plan specifically preserved the creditor's right to pursue the guarantors. Although the Plan in the case at hand makes no such specific preservation of a right, the analysis regarding 11 U.S.C. § 524(e), provides insight and support for J&B's argument. *See Johnson*, 11 F.3d at 1266.

The significance of the choice of the term "refinancing" is buttressed by other language in the bankruptcy court's order. The order required the Kingreys to pay off the entire secured balance of their debt to the bank "in full" on or before the nineteenth month following the confirmation of their reorganization plan. *Therefore, both the Kingreys and the bank were required to pay off this debt in full by October 2000. Replacing the 1996 note with an entirely new note in 2000 would comply with the bankruptcy court's order because it would have the effect of paying off the 1996 note in full.*

The 2000 note reflects the Kingreys' and the banks' compliance with the bankruptcy court's order. The order would not have permitted the Kingreys and the bank to simply renew or "reaffirm" the 1996 note. It required the 1996 note to be refinanced and paid in full. The Kingreys obtained the "refinancing" ordered by the court, and this refinancing was used by the bank to pay the outstanding balance of the 1996 note "in full." Any other interpretation of the 2000 transaction between the bank and the Kingreys would require us to find that the Kingreys and the bank failed to comply with the bankruptcy court's order. We decline to make such a finding because we presume that parties such as the Kingreys and the bank would never knowingly fail to comply with a valid court order.

*Cumberland Bank*, 211 S.W.3d at 231 (emphasis added). As we see from the detailed discussion of the facts in *Cumberland Bank* case and our recitation of the facts in this case, they are clearly distinguishable because Foster Business Park did not "refinance" the $1,500,000 Note and thus did not substitute one debt for another. Accordingly, the holding in *Cumberland Bank* provides no relief of the Guarantors' contractual obligations under the loan documents.

The respective contractual rights and obligations of Plaintiff and the Guarantors are established by the various loan documents. The Loan Agreement executed by the debtor, Foster Business Park provides, in pertinent part:

Section 1.3 Interest, Commitment Fee. The Borrower [Foster Business Park] shall pay interest on the outstanding principal balance of the loan at the rate(s) of interest specified in the Note. . . . After maturity, whether by acceleration or otherwise, accrued interest (a) shall be payable on demand and (b) shall accrue in the discretion of the Lender at a rate not to exceed the highest contract rate of interest permitted by law (24%).

The Note provides, in pertinent part:

After maturity, whether by acceleration or otherwise, interest shall be payable on demand and charged (at the discretion of the Payee) at an interest rate not to exceed the maximum contract rate of interest permitted by applicable law (24%) commencing from and after thirty (30) days from the date of such maturity.

The Guaranty Agreements signed by the two individual guarantors, Tarun Surti and his wife Lata Surti, state:

> Guarantor joins in the Borrower's representations, warranties, covenants, and agreements set forth in the Loan Agreement just as if it were the Guarantor making the loan.

A separate Commercial Guaranty Agreement executed by the corporate guarantor, Arte Corporation Inc., states:

> The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender . . . and includes all of Borrower's liabilities, obligations and debts to Lender . . . .

By paying the Allowed Claim Amount in full, Foster Business Park discharged *its debt* to Plaintiff. The satisfaction by Foster Business Park of the Allowed Claim Amount of $1,520,037.29, however, did not affect or extinguish the liability of the Guarantors, other than to reduce the amount of the indebtedness. *See* 11 U.S.C. § 524(e) (which provides that "the discharge of a debt of a debtor does not affect the liability of any other entity on . . . such debt").

## The Rate of Interest

Having determined the Guarantors' liability on the indebtedness was unaffected by the discharge of Foster Business Park in bankruptcy, we turn our attention to the Guarantors' argument that Plaintiff is precluded from seeking to recover interest at the default rate of 24% due to the bankruptcy court's application of the pre-default rate of 8.5%.

The loan documents expressly provide that the "Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender . . . and includes all of Borrower's liabilities, obligations and debts to Lender . . . ." The loan documents also provide that after maturity, whether by acceleration or otherwise, interest shall be payable at an interest rate not to exceed 24%. The bankruptcy court applied Section 1124 to determine the amount of the "allowed claim" against Foster Business Park for purposes of reorganization of the debtor's financial obligations to Plaintiff and other creditors. The determination of the amount of the "allowed claim" only affects the amount a creditor may recover against a debtor in a bankruptcy proceeding and, as we learn from 11 U.S.C. § 524(e), that determination, and the resulting discharge of the debtor, does not affect the liability of others on such debt, which in this case are the three Guarantors.[3]

---

[3] It is significant to note that the Guarantors were not parties to the bankruptcy proceedings; therefore, the principle of *res judicata* does not apply to the Guarantors. *See Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990) (stating that in order to be successful, a party asserting a *res judicata* defense must demonstrate: (1) that the underlying judgment was rendered by a court of competent jurisdiction; (2) that the same parties were involved in both suits; (3) that the same cause of action was involved in both suits; and (4) that the underlying judgment was on the merits).

Section 1124 (2)(B) of the bankruptcy code (11 U.S.C. §1124 (2)(6) expressly authorizes the determination of the amount of a bankruptcy claim in a Chapter 11 proceeding to be based on the original contract rate of interest, notwithstanding the fact the loan documents authorized acceleration of the maturity date and the recovery of a higher rate of interest after default. The Bankruptcy Court invoked Section 11242)(6) to set the amount of the allowed claim in order to discharge the debt of Foster Business Park. Based upon the foregoing analysis, we have determined the Chancellor correctly applied the default interest rate of 24%, as the loan documents permit, to determine the deficiency owing by the Guarantors on the indebtedness.

## Is the Default Interest Rate Usurious?

Having determined the Chancellor was authorized to apply the default rate of interest, we must now address the Guarantors' contention that the 24% interest is usurious. The Guarantors contend the default rate of 24% is usurious as a matter of law because the original holder of the Loan Agreement, The Bank of Nashville, was not entitled to accrue interest at such rate. The Guarantors rely on Tenn. Code Ann. § 45-5-301(2)(b) to make this assertion. The Guarantors further contend that The Bank of Nashville was only entitled to accrue interest in accordance with the "formula rate" for installment loans set forth in Tenn. Code Ann. § 45-2-1106. We find no merit to their argument.

The Bank of Nashville, at the time of the execution of the Note, was what the industry classifies as a state-chartered bank. As the Guarantors correctly contend, Tenn. Code Ann. § 45-2-1106 places certain limitations on the annual rates of interest state charted banks may charge from the inception of installment loans to the originally contracted maturity date. Tenn. Code Ann. § 45-2-1106. The Guarantors further assert that the only state financial institutions that are expressly authorized by statute to charge interest as high 24% are the industrial loan and thrift companies, citing Tenn. Code Ann. § 45-5-301,[4] and state that The Bank of Nashville was not an industrial loan and thrift company. It is upon these facts the Guarantors contend the default interest rate of 24% was usurious. The fallacy with the Guarantors' argument is that the statute they cite is not the only statute that pertains to the maximum rate of interest a state-chartered bank may charge.

Several years prior to the execution of the Note at issue, the Tennessee General Assembly afforded state chartered banks the right to be more competitive in the financial market place with the enactment of a statute commonly known as a "wildcard statute." Tenn. Code Ann. § 45-2-601. The wildcard statute affords the state chartered-banks the right to exercise the same powers that a national bank located in Tennessee could exercise. *Id.* In pertinent part, the wildcard statute provides:

> any state bank may exercise any power or engage in any activity which it could exercise or engage in if it were a national bank located in Tennessee, subject to regulation by the commissioner for the purpose of maintaining the state bank's safety and soundness.

---

[4]When the loan at issue was made, industrial loan and thrift company registrants were statutorily authorized to charge interest "[o]n loans where the total amount of the loan is one hundred dollars ($100) or more, at any rate not in excess of a maximum effective rate of twenty-four percent (24%) per annum. . . ." Tenn. Code Ann. § 45-5-301.

Tenn. Code Ann. § 45-2-601.[5] Moreover, the General Assembly expressly authorized state-chartered banks to "make loans upon the same terms and at the maximum effective interest rates as loans are authorized and credit extended by national banks in this state," notwithstanding any provision to the contrary in the Tennessee Code. Tenn. Code Ann. § 45-2-1108.[6]

The United States Congress has authorized national banks to charge interest at the rates allowed by the laws of the state in which the banks are located. *See* 12 U.S.C. § 85. As we stated earlier, Tennessee expressly authorizes industrial loan and thrift companies to charge an interest of 24% per annum. *See* Tenn. Code Ann. § 45-5-301(2)(b). As a consequence of the interplay of the state and federal legislation, The Bank of Nashville was authorized to charge interest at the default rate of 24% when the Note at issue was executed.[7] Accordingly, the default interest rate of 24% is not usurious.[8]

Interest on negotiable and nonnegotiable instruments shall accrue according to the terms of the instrument, Tenn. Code Ann. § 47-14-109, and the lawful holder of a note is entitled to enforce the instrument. *See* Tenn. Code Ann. § 47-3-301. Accordingly, because the Note is not usurious, Plaintiff, as the lawful holder of the Note, is entitled to collect interest at the default rate stated in the Note.

### The Date From Which The Default Interest Accrues

In its Final Order entered August 30, 2005, the Chancellor ruled that prejudgment interest on the unpaid principal balance shall accrue at the rate of 24% per annum from the date that the loan matured and was payable in full, December 20, 2002.[9] The Guarantors contend this was error. They

---

[5]The legislative history of this provision indicates that the purpose of the wild card statute was to "preserve the competitive equality of state and national banks." Atty Gen. Op. 04-04-059, 2004 WL 874924 at *6-7 (filed Apr. 7, 2004) (citing Leg. Hist. Senate Session Mar. 19, 1986 (Sen. Albright)).

[6]Tenn. Code Ann. § 45-2-1108, in pertinent part, provides:

> Notwithstanding any provision to the contrary in this chapter and chapter 1 of this title or elsewhere, state banks have the power to make loans upon the same terms and at the maximum effective interest rates as loans are authorized and credit extended by national banks in this state.

[7]In 1980, the Tennessee Attorney General published an Opinion on the issue of whether state banks can make loans upon the same terms and conditions, including maximum effective interest rates allowed to industrial loan and thrift companies. Atty. Gen. Op. 80-212, 1980 WL 104028 at *1 (filed 1980). The Attorney General opined that "State-chartered banks may make loans upon such terms and conditions, including maximum effective interest rates and loan charges, as are permitted to be made by industrial loan and thrift companies. . . ." The opinion was based on Tenn. Code Ann. § 45-435 (1979), which is nearly identical to Tenn. Code Ann. § 45-2-1108.

[8]Tenn. Code Ann. § 47-14-106(1)(B) permits contracts to contain a fixed rate of interest which was permissible "at the time the loan was made."

[9]With regard to post-judgment interest, the trial court stated the following:

(continued...)

contend the non-default rate of 8.5% interest should have applied until the first assertion of the default rate on August 7, 2003, which was the date Plaintiff filed its proof of claim in the bankruptcy proceeding. We respectfully disagree.

The Loan Agreement provides in Section 1.3 that "the Borrower shall pay interest on the outstanding principal balance of the loan at the rate(s) of interest specified in the Note." Significant to the issue of default, the Agreement further provides that "After maturity, whether by acceleration or otherwise, accrued interest (a) shall be payable on demand and (b) shall accrue in the discretion of the Lender at a rate not to exceed the highest contract rate of interest permitted by law (24%)." The Note also contains an option clause, which states that the "Lender, *at its option*, may . . . increase the interest rate on this Agreement to 24.000%."

The loan documents do not set forth a requirement that the holder of the note must provide notice or act affirmatively to demonstrate to the Guarantor that it intends to collect interest at the default rate. To the contrary, all three Guaranty Agreements expressly waive notices. The Guaranty Agreement, by which Mr. and Mrs. Surti are bound, contains an express waiver clause:

> **Waiver**. Guarantor hereby waives (i) any requirement of presentment, protest, notice of dishonor, notice of default, notice of acceptance, demand and *all other actions or notices that may otherwise be required on Lender's part* in connection with the Obligations . . . .(emphasis added)

The Commercial Guaranty Agreement by which Arte Corporation is bound contains a similar waiver clause that states "Except as prohibited by applicable law, Guarantor waives any right to require Lender . . . to make any presentment, protest, demand or *notice of any kind* . . . ."

Finding no condition precedent to Plaintiff's entitlement to charge the default interest rate of 24% other than the contractual limitation that it not commence prior to maturity, which was scheduled for December 20, 2002, we affirm the ruling of the Chancellor as to the date of accrual of prejudgment interest at the default rate.

## Attorney's Fees

After prevailing on the foregoing issues in the trial court, Plaintiff filed a request for attorneys fees. The fee request pertained to expenses incurred in not only this civil action, but two other related actions among these parties and Foster Business Park. Specifically, Plaintiff sought attorney's fees it incurred in *Foster Business Park, LLC et al. v. The Bank of Nashville and J&B Investments, LLC*, Davidson County Chancery Court No. 05-767-I (hereinafter the "Usury Action"),

---

[9](...continued)
The Court further concludes that in accordance with Tenn. Code Ann. § 47-14-121, post-judgment interest on the unpaid balance of the Summary Judgment shall accrue at the rate of twenty-four percent (24%) per annum from the Effective Date of this Order, August 15, 2005, until the unpaid balance of the Summary Judgment is satisfied.

and fees incurred in a related torts case, *Foster Business Park, LLC et al. v. Mark Winfree, et al.,* Davidson County Chancery Court No. 04-319-I (hereinafter the "Tort Action"). Following a hearing on the issue, the Chancellor awarded Plaintiff attorney fees for two of the three lawsuits, the instant litigation and the Usury Action and denied Plaintiff's request for attorney fees incurred in the Tort Action. The Guarantors contend the Chancellor erred in including attorney's fees incurred by in the Usury Action.

Litigants must pay their own attorney's fees absent a statute or agreement providing otherwise. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000) (citing *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). Courts should enforce provisions in contracts that expressly allow a party to recover its attorney fees incurred in disputes over the contract. *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984)). The entitlement to recover attorney's fees, however, is limited to the situation agreed to by the parties in the contract, and the fee provision is subject to the rules of contract interpretation. *Clark v. Rhea,* No. M2002-02717-COA-R3-CV, 2004 WL 63476, at *2 (Tenn. Ct. App. Jan. 13, 2004). Appellate review of the trial court's interpretation of a fee provision in a contract is reviewed *de novo* as a question of law.[10] *Id.*

The Chancellor explained her ruling in the Amended Memorandum and Order Granting Plaintiff's Amended Motion to Set Judgment Amount and Second Amended Order of Judgment. The relevant part reads:

> [T]he Court will determine its fee award based upon fees actually incurred by Plaintiff in this lawsuit and the Usury Lawsuit. The Court rejects the Plaintiff's prayer for an award of fees incurred in the Tort Lawsuit, as the Court finds that the Tort Lawsuit does not arise out of the collection of the indebtedness at issue in this case. The Court further finds the fee award in this matter shall comprise all fees incurred by Plaintiff in this lawsuit and the Usury lawsuit from July 28, 2004 until the judgment is fully satisfied and the Usury Lawsuit is complete.

The Chancellor also commented from the bench that "the usury issue got litigated twice in a way, and it should have been litigated once." As such, the Guarantors "got two bites at the apple" to litigate the usury issue.

The Guarantors contend that the Guaranty Agreements only entitled Plaintiff to attorney's fees incurred in enforcing the Guaranty Agreements, not incurred in other related matters. Accordingly, the Guarantors submit, the fees incurred by Plaintiff in defense of the Usury Lawsuit were not incurred in the course of enforcing the Guaranty Agreements. Therefore, they contend, the fees awarded incurred in the Usury Lawsuit are not recoverable.

---

[10]Once the court has determined that a party is entitled to recover attorney fees, the amount of the award of attorney fees rests within the sound discretion of the trial court, which is reviewed by the appellate courts under the abuse of discretion standard. *Mimms v. Mimms*, 234 S.W.3d 634, 641 (Tenn. Ct. App. 2007).

The Guaranty Agreement upon which Plaintiff sought to recover its attorney's fees reads as follows:

> **Cost of collection against guarantor.** Guarantor agrees to pay all costs of collection, including, without limitation, attorneys fees and compensation for time spent by Lender's employees, that Lender may incur *in enforcing the terms of this Guaranty against Guarantor*. (emphasis added).

The attorney's fees incurred by Plaintiff for defending the Usury Action brought by Foster Business Park is not a cost incurred to enforce the Guaranty Agreement against the Guarantors. Instead, those costs were incurred defending the usury claim brought by Foster Business Park, which is not a party to this action. The Guaranty Agreements do not afford Plaintiff the right to recover costs incurred in a separate action unrelated to the enforcement of the Guaranty Agreements.

We, therefore, conclude that the Chancellor erred by awarding Plaintiff its costs and attorney's fees incurred in the Usury Action because that action did not pertain to the enforcement of the Guaranty Agreements against the Guarantors. Accordingly, we remand to the trial court for further determination of the attorney's fees incurred in the instant case.

### IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with the opinion. The costs of appeal are assessed against Appellants, Tarun N. Surti, Lata Surti, and Arte Corporation, Inc., jointly and severally, and their surety, for which execution may issue.

_____
FRANK G. CLEMENT, JR., JUDGE